Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or to amend the award, the Full Commission AFFIRMS and ADOPTS with minor modifications, the Opinion and Award of the deputy commissioner as follows:
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in the Pre-trial Agreement and at the hearing before the deputy commissioner as:
 STIPULATIONS
1. All parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act and Fireman's Fund Insurance Company is the administrator for Abbott Laboratories, Self-insured.
2. The employee contracted an occupational disease, bilateral carpal tunnel syndrome, arising out of and in the course of employment on September 21, 1992.
3. The average weekly wage of the employee, including overtime and all allowances is $340.00
4. The employer paid compensation to the employee at the rate of $226.25 per week for the period beginning March 8, 1993 and continuing through June 21, 1993 pursuant to the Agreement for Compensation for Disability (I.C. Form 21) entered into by the parties on March 16, 1993.
5. All I.C. forms previously filed in this action are stipulated as evidence.
6. The parties further stipulate that the only issue before the Commission is to what benefits, if any, is the plaintiff entitled under the North Carolina Workers' Compensation Act after June 21, 1993.
 ***********
Based on the competent, credible evidence of record, the Full Commission adopts the findings of fact of the deputy commissioner with minor modifications and finds as follows:
 FINDINGS OF FACT
1. At the time of hearing plaintiff was 48 years old and had a high school diploma. She was hired by Abbott Laboratories on April 4, 1976, where she worked as a production operator until June 21, 1993.
2. Around May 15, 1991, plaintiff experienced pain and numbness in both hands, but more prominently in the right hand. Dr. Margaret Sowerwine, Abbott's company doctor, started treating her at that time with ibuprofen and splints on her hands. Over the next year, plaintiff occasionally returned to Dr. Sowerwine with complaints of bi-lateral wrist pain.
3. On September 21, 1992, plaintiff's bilateral wrist pain had become more pronounced and was not responding to conservative treatment. Dr. Sowerwine ordered a second NCV test, which was done on February 18, 1993. The test revealed that plaintiff had a significant delay of the right distal latency for the right median sensory nerves. She also had significant delay in all sensory components for the right median sensory nerve. The diagnosis was right carpal tunnel syndrome. Dr. Sowerwine noted that plaintiff had a right median motor distal latency of 6.88 which was past the point that Abbott's employees were normally referred for surgery.
4. Dr. Sowerwine arranged an appointment for plaintiff with Dr. J. Greg Nelson, an orthopedic surgeon, for March 8, 1993. The referral was made for Dr. Nelson to perform a right hand carpal tunnel release for plaintiff. Dr. Nelson injected the right carpal tunnel with Aristocort and Marcaine rather than proceeding with surgery. On follow-up plaintiff's wrist symptoms were not improved. On March 19, 1993, Dr. Sowerwine decided that Dr. Nelson was going to do the right carpal tunnel release, or she was going to send plaintiff to another surgeon. Dr. Nelson did the surgery on March 30, 1993.
5. At post-operative follow up on April 2, 1993, plaintiff had no pain on flexion or extension of her right hand, less numbness and negative Tinel's and Phalen's signs. However, her left wrist was extremely painful. Dr. Nelson injected the left wrist with Triamcinolone and Marcaine and referred plaintiff to Nash Day Hospital Physical Therapy for fluidotherapy. When plaintiff returned to Dr. Nelson on April 22, 1993, her left wrist was still painful. Dr. Nelson summarily dismissed her complaints of left hand pain saying that his examination, x-rays, EMG and nerve conduction tests revealed no abnormality in her left hand.
6. After examining plaintiff on April 22, 1993, Dr. Nelson recommended that she participate in a work hardening program for 2 — 3 weeks and then return to her normal work duties. When Nash Day Hospital Physical Therapy received the prescription for work hardening, the therapist recommended postponement of right hand therapy for two weeks so that the surgical incision could heal. Dr. Nelson looked at the incision and said it was primarily healed without evidence of dehiscence.
7. On May 13, 1993, Nash Day Hospital Physical Therapy reported that plaintiff was "dying of right arm, as well as left arm pain . . . and it would be pointless to restart work hardening." Dr. Nelson discussed plaintiff's progress with an occupational therapist on May 14, 1993, and was told that the therapist could not work with plaintiff because of her pain. Dr. Nelson discontinued the physical therapy. Dr. Nelson was of the opinion that plaintiff might be suffering form reflex sympathetic dystrophy. He sent her to Nash Day Hospital for a cervical ganglion block, which provided relief for only about an hour.
8. On May 21, 1993, Dr. Nelson wrote a letter, releasing himself as treating physician for plaintiff. In the letter, he concurred with Dr. Sowerwine's proposed treatment plan of May 13, 1993 which recommended that plaintiff continue with tricyclics and passive physical therapy, and that she be referred to a psychologist. Dr. Nelson persisted in his opinion that the plaintiff should return to her normal work activities without restrictions.
9. Beginning on May 13, 1993, Dr. Sowerwine assumed sole responsibility for plaintiff's treatment. She disagreed with Dr. Nelson's opinion that plaintiff was capable of returning to full work duties, without restrictions. Dr. Sowerwine continued plaintiff on physical therapy and tricyclics. Dr. Sowerwine was convinced that there was a psychological component to plaintiff's pain, so she referred her to Deborah Burnett, the company psychologist, and made an appointment for plaintiff to see Samuel J. Moon, M.D., at Duke Hospital, on June 29, 1993. Dr. Moon is a professor of family medicine who, through practice and experience, has become a specialist in hand problems and industrial problems causing disability.
10. On June 10, 1993, Dr. Sowerwine felt pressured by defendant to send plaintiff back to work, because there were no significant physical findings to explain her pain, and Abbott Laboratories was aware that Dr. Nelson had released plaintiff to return to work. Dr. Sowerwine was familiar with production line work and knew that the speed and demands of the work are controlled collectively by the line workers. The "line" cannot accommodate the physical disabilities of an injured employee. Nevertheless, on June 11, 1993, Dr. Sowerwine modified Dr. Nelson's return to work with no restrictions by limiting plaintiff to four hours per day for two weeks.
11. Plaintiff returned to work on Monday, June 14, 1993. She worked for about an hour, then reported to Employee Health with a burning pain and swelling over the radial volar wrist on both sides. Dr. Sowerwine sent plaintiff home with instructions to take Elavil and soak her hands in cold water every one to two hours for the remainder of the day. Dr. Sowerwine closed her note of June 14, 1993, by writing, "If plaintiff cannot tolerate more that an hour by the end of the week, then we'll give up, but at least we'll have some extra information for Dr. Moon."
12. On Tuesday, June 15, 1993, plaintiff worked from 6:30 to 7:00 am, and experienced burning pain in both hands and arms up to the elbow. She received heat treatment at Employee Health and was examined by Dr. Sowerwine, who released her from work for the day. Dr. Sowerwine told plaintiff that she would not be in her office on Wednesday and Thursday, and to work as long as she could tolerate the pain and go home. On Friday, June 18, 1993, plaintiff was unable to work for more than an hour and was released from work by Dr. Sowerwine.
13. On Monday, June 21, 1993, plaintiff did not think that she could continue stacking bags because it was causing her so much pain. She went to "personnel" and asked if she could be placed in overwrap. This was an inspection job and did not require her to use her hands. Although the conversation between plaintiff and the personnel manager is controverted, the Full Commission defers to the deputy commissioner's findings of fact concerning what transpired between plaintiff and the personnel manager. Plaintiff was told by the personnel manager that there were no jobs available in overwrap and if she could not stack bags, defendant-employer had no work for her. The personnel manager also told plaintiff that she would have to be escorted from the premises by the security guard and that she would be notified about liquidating her Abbott stock. Plaintiff did not "quit" her job. She thought she might have been "fired," because she was escorted to the door.
14. It is undisputed that defendant-employer terminated plaintiff's temporary partial disability and medical benefits and filed a Form 28 with the Industrial Commission with a hand-written notation, "*Quit 6/21/93, Stop WC coverage." Defendant-employer did not apply for approval from the Industrial Commission to terminate plaintiff's workers' compensation benefits.
15. On July 7, 1993, plaintiff went to J. Th. Bloem, M.D., orthopedist, for another medical opinion. Dr. Bloem diagnosed plaintiff as suffering from bilateral carpal tunnel syndrome. Defendant-employer would not authorize Dr. Bloem's request for new blood work or x-rays. Without an authorization for treatment, Dr. Bloem would not assume the responsibility of treating plaintiff.
16. In March of 1994, plaintiff managed to get an appointment with Robert J. Spinner, M.D., in the Orthopaedics Department of Duke Medial Center. After examining plaintiff, Dr. Spinner made a preliminary diagnosis of bilateral reflex sympathetic dystrophy. He further made a request to the Neurology Department for EMG and nerve conduction studies and started plaintiff on Procardia 10mg.
17. Nerve conduction testing demonstrated electrophysical evidence of mild right carpal tunnel syndrome. There was no evidence of left carpal tunnel syndrome or right cervical radiculopathy. On follow-up in the Orthopaedics Department, plaintiff was described as suffering from diffuse and disabling pain, worse in the right hand. The EMG/NCS tests showed no conclusive deficit to explain the diffuse pain described by plaintiff in her neck and both hands and arms.
18. Plaintiff's symptoms suggested that she might be suffering from fibromyalgia. Therefore, she was referred to John. S. Sundy, M.D., a rheumatologist. Dr. Sundy diagnosed plaintiff as suffering from fibromyalgia with muscle spasms, carpal tunnel syndrome, sleep disorder and depression. The carpal tunnel syndrome, fibromyalgia and depression were interrelated. According to Dr. Sundy, having to cope with her wrist and arm pain, sleeplessness and fibromyalgia was causing plaintiff to be depressed. The depression, in turn, was aggravating and amplifying symptoms of the carpal tunnel syndrome and fibromyalgia.
19. Dr. Sundy was of the opinion that the immediate goal in the treatment of plaintiff was to address the depression. He referred her to David F. Naftolowitz, M.D., in the Psychiatric Department. Dr. Naftolowitz diagnosed plaintiff as suffering from a somatoform pain disorder. Patients with this disorder have a psychological component that causes them to magnify pain. They feel and describe greater pain than one would expect, given their physical problems. Somatoform disorders originate in the subconscious and are not the result of a conscious thought process.
20. Plaintiff's admittedly compensable carpal tunnel syndrome provides a clear, physical basis for her hand and wrist pain. This pain has developed into a chronic pain syndrome, which is made worse by somatoform disorder. Because of her continuous pain and her inability to work, plaintiff developed and suffers from major depression. Plaintiff's depression is a direct and natural consequence of her carpal tunnel syndrome and resulting chronic pain syndrome.
21. Defendant-employer has admitted that plaintiff contracted an occupational disease, bilateral carpal tunnel syndrome, on a Form 21 Agreement for Compensation, dated March 16, 1993. On June 21, 1993, while plaintiff was attempting to return to work and before she had regained her pre-injury wage earning capacity, defendant-employer terminated her temporary partial disability and medical compensation.
22. Plaintiff filed a Form 33 to reinstate workers' compensation benefits after June 21, 1993. Defendant filed a Form 33R, denying that any benefits were owed to plaintiff on the ground that she had unjustifiably refused suitable employment. The claim was referred to mediation, which ended in an impasse on January 24, 1996.
23. Defendant has failed to rebut plaintiff's presumption of continuing disability created by the Form 21 Agreement. Plaintiff was unable, as a result of her carpal tunnel syndrome and chronic pain syndrome to perform the work made available to her by defendant-employer. The offer of employment was not suitable to plaintiff's physical limitations; therefore, plaintiff did not unjustifiably refuse suitable employment.
24. Plaintiff is entitled to reinstatement of her temporary total disability compensation after June 21, 1993.
 ***********
Based on the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Defendant-employer admitted liability for plaintiff's carpal tunnel syndrome by signing the Industrial Commission Form 21 Agreement to pay disability compensation. Once defendant-employer accepted plaintiff's occupational disease as compensable on a Form 21, there was a presumption that her disability continued until she returned to work at wages equal to those she was receiving at the time her injury occurred.Watkins v. Motor Lines, 279 N.C. 132, 137, 181 S.E.2d 588,592 (1971). Kisiah v. W.R. Kisiah Plumbing, Inc., 124 N.C. App. 72,476 S.E.2d 434 (1996). Until defendant proves plaintiff is employable, or no longer disabled, it must pay workers' compensation benefits to her. Franklin v. Broyhill FurnitureIndustries, 123 N.C. App. 200, 206, 472 S.E.2d 382, 388
(1996).
2. In order to prove that plaintiff is capable of earning pre-injury wages, defendant must produce evidence that suitable jobs are available to plaintiff and that she is capable of getting one, taking into account her physical and vocational limitations. A job is suitable if the employee is capable of performing it given her age, education, physical limitations, vocational skills, and experience. Franklin, at p. 206.
3. Plaintiff's return to work at diminished wages did not terminate her right to workers' compensation benefits nor did it automatically deprive her of the presumption of continuing disability created by the Form 21 agreement. Kisiah v. W.R.Kisiah Plumbing, Inc., 124 N.C. App. 476 S.E.2d 434 (1996).
4. The plaintiff was unable to perform the job duties assigned upon her return to work. The job offered was not suitable to plaintiff's physical limitations resulting from her compensable injury. Defendants did not offer plaintiff suitable employment. Therefore, plaintiff did not unjustifiably refuse suitable employment.
5. Plaintiff's depression is a direct and natural consequence of her compensable injury. If an employee receives an injury which is compensable and the injury causes her to become so emotionally disturbed (and severely depressed) that she is unable to work; she is entitled to compensation for total incapacity under N.C.G.S. § 97-29. Fayne v. Fieldcrest Mills,Inc., 54 N.C. App. 144, 146, 282 S.E.2d 539 (1981).
6. Plaintiff is unable to work due to her admittedly compensable bilateral carpal tunnel syndrome and her depression.
7. Plaintiff will likely need vocational rehabilitation to assist in her efforts to return to work.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Defendants shall pay temporary total disability benefits to plaintiff at the compensation rate of $226.95 per week from June 21, 1993 through September 19, 1996, the effective date defendant resumed paying plaintiff temporary total disability benefits pursuant to the Commission's Order dated October 17, 1996. That compensation has accrued and shall be paid to plaintiff in a lump sum.
2. Defendants shall continue paying plaintiff temporary total disability benefits at the compensation rate of $226.96 per week until further order of the Commission.
3. Defendants shall pay all medical expenses incurred or to be incurred in the future by plaintiff as a result of her compensable injury when bills for same have been submitted and approved through procedures adopted by the Commission.
4. An attorney's fee in the amount of twenty-five percent (25%) of this Award is hereby approved for plaintiff's counsel payable as follows: Twenty-five percent of the Award which has accrued shall be deducted and sent to plaintiff's counsel; additionally, every fourth check due plaintiff shall be sent directly to plaintiff's counsel.
5. Defendants shall pay the cost due the Commission.
 S/ _____________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/ _____________ CHRISTOPHER SCOTT COMMISSIONER
S/ _____________ RENÉE C. RIGGSBEE COMMISSIONER
BSB:md